IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| VIRGINIA I. SELWYN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:02-1123 |
| | ) | JUDGE NIXON |
| THOMAS E. WHITE, SECRETARY, | ) | MAGISTRATE BROWN |
| U.S. DEPARTMENT OF THE ARMY, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM ORDER**

Plaintiff Virginia I. Selwyn ("Selwyn" or "Plaintiff") an employee of the United States

Army Corps of Engineers ("Corps"), Nashville District, filed this civil action pursuant to Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-16 alleging sex

discrimination and retaliation in violation of Title VII.  Remaining at issue after the Court's

partial grant of Defendant's Motion for Summary Judgment, are Plaintiff's retaliation claims.

(Doc. No. 25)  Plaintiff alleges that Defendant's failure to (1) upgrade her from a GS-12 to a GS-

13 grade level, and (2) promote her to the Chief of Contracting position was in retaliation for her

prior Equal Employment Opportunity ("EEO") activity.  The Court held a bench trial on these

two issues between October 5 and October 7, 2004.  For the reasons set forth below, the Court

finds that Plaintiff has not met her burden of persuasion and **ENTERS JUDGMENT** in favor of

Defendant.[1]

_____

[1] Defendant filed a Motion In Limine.  (Doc. No. 31.)  The parties reached an agreement
on the motion (Doc. No. 34, Tr. at 5-6), and the Court requested post-trial motions to strike in
the event either party presented evidence that went beyond the bounds of the agreement.  No
such motion was filed, rendering the Motion In Limine **MOOT**.

## I.     MATERIAL FACTS

Selwyn, was hired by the Corps' Nashville District in 1991 as a Supervisory Contract Specialist at the grade level of GS-12.[2]  In 1993, as a result of a grievance filed with the Equal Employment Opportunity Commission ("EEOC") by another employee of the Corps, Plaintiff was reassigned to non-supervisory Contract Specialist position at the GS-12 grade level.  For reasons not germane to the remaining issues in this lawsuit, Selwyn filed a grievance with the EEOC in November 1992, and again in March 1996, both of which were resolved in her favor.

Due to a restructuring of the Corps, Larry Cook ("Cook"), formerly the Chief of Contracting in the Ohio River Division in Cincinnati, was laterally reassigned to the same position in Nashville on October 27, 1996.  Cook was Plaintiff's supervisor from 1996 until he retired in May 2002, and maintained a GS-13 grade level during that entire period.  When Cook was located in Cincinnati as a procurement analyst to the Director of Contracting, he remembered "hearing something of an EEO issue with Ms. Selwyn and the chief of contracting [in Nashville], over evaluations or something like that."  (Doc. No. 35, Tr. at 202.)  Cook, however, was not involved and from his testimony it is unclear whether he was referring to Selwyn's 1992 or 1996 EEO activity.

Prior to Cook's employment in the Nashville District, the Corps had conducted a study to determine the most efficient organizational structure for the Contracting Division, but had yet to implement the study.  In accordance with the study's recommendations and advice from Wanda

---

[2]  The General Schedule ("GS") is a pay system covering most white-collar civilian federal employees.  The GS system is divided into grades 1 through 15, and each grade is further divided into ten steps.

Case 3:02-cv-01123   Document 39   Filed 01/20/06   Page 2 of 40 PageID #: 2

Coleman ("Coleman"), the Personnel Specialist at the Nashville Civilian Personnel Activity

Center ("CPAC"), Cook restructured the Contracting Division by creating a third team out of the

two existing teams. This team, the Environmental Team, required an individual experienced in

the unique skill of reimbursable contracting. Selwyn, who was a Team Leader for the Architect,

Engineering and Construction team at the time, had the relevant experience and was offered the

position of Team Leader for the Environmental Team, which she accepted. At this time, Selwyn

did not ask for or receive an increase in her grade level, and remained a GS-12.

In addition to Selwyn, the Environmental Team consisted of two Contract Specialists,

Valerie K. Carlton ("Carlton"), who held a GS-9 grade level, and Sara L. Parton ("Parton"), who

held a GS-11 grade level. Carlton and Parton were selected for the team because Cook believed

they were capable of developing the skills for reimbursable contracting. Indeed, it appears they

were very capable, because under Selwyn's tutelage, Carlton was upgraded from a GS-9 to a GS-

11 grade level, and both Carlton and Parton were eventually upgraded to a GS-12 grade level.

Moreover, Cook rated Selwyn as "excellent," the highest rating a person could receive, on every

annual evaluation he completed, and Cook's supervisor, as senior rater, always concurred with

these evaluations.

### A. FAILURE TO UPGRADE PLAINTIFF'S POSITION FROM GS-12 TO GS-13 GRADE LEVEL

In August 1999, approximately three years after accepting the Environmental Team

Leader position, Selwyn began to seek an increase from a GS-12 to a GS-13 grade level. Selwyn

testified that she requested the upgrade as a result of the expansion in the level and complexity of

her responsibilities. Selwyn also believed she deserved the upgrade because, according to her,

she had more experience, knowledge and training in the subject matter than her immediate

supervisor, Cook, and was the only person called upon when there was a question regarding this

subject. Accordingly, Selwyn spoke with Cook, "and asked if he would consider giving [her]

credit for the work [she] was doing, because [her] job description did not reflect what [she] was

doing." (Doc. No. 34, Tr. at 16.) Cook was "very supportive[, and] said that he would look into

the matter and see what he could do." (Id. at 17.) Cook also requested that Selwyn draft a memo

recommending how the entire team could be restructured. As a result, on August 11, 1999,

Selwyn sent Cook a memorandum requesting that her position be upgraded from a GS-12 to a

GS-13 grade level, and that Carlton and Parton also be upgraded from a GS-11 to a GS-12 grade

level. As part of this restructuring, Cook and Plaintiff also discussed having Cook's position

upgraded from a GS-13 to a GS-14 grade level, although it is unclear when this discussion took

place.

Cook, Selwyn, Coleman, and John Gary Restey ("Restey"), Chief of CPAC in the

Nashville District and Coleman's supervisor, had a meeting to discuss the procedure required to

evaluate and classify Selwyn's position at the appropriate grade level. During that meeting,

Coleman and Selwyn had a minor dispute, and it was decided that Restey would be the CPAC

advisor on this issue, but Coleman would continue to handle all administrative aspects.

Cook initially requested a desk audit of Selwyn's position, which would have involved an

independent evaluator coming on-site and comparing the job description with the duties actually

performed. Coleman, however, advised that the Corps no longer performed desk audits. Instead,

the process required the employee to work with his or her supervisor, who, in turn, would

coordinate with CPAC to draft a revised position description that accurately reflected the duties

-4-

the employee performed. CPAC would then forward the revised job description to the Civilian Personnel Operations Center ("CPOC"), in Huntsville, Alabama. CPOC would classify the draft position description and return it to CPAC. If the position were re-classified, and the supervisor and CPAC agreed with the classification, then a recommendation would be made to the individual who had delegated classification authority for approval.

In the meantime, Major Richard Louis Shelton ("Major Shelton") became the Deputy Commander of the Nashville District Corps of Engineers in June 2000. Major Shelton had not worked in the Corps of Engineers in Nashville before this time, and was not aware of Selwyn's 1992 or 1996 EEO activity. As Deputy Commander, Major Shelton was Cook's direct supervisor, he oversaw the contracting division, and was the Delegated Classification Officer. That is, Major Shelton was the only person with the authority to approve the classification or re-classification of positions in the Contracting Division.

Within the first six months of Major Shelton's transfer to Nashville, Cook informed Major Shelton that they were seeking an upgrade for Selwyn. At that time, Cook did not inform Major Shelton that he was also seeking an upgrade for himself or for the two Contract Specialists, Carlton and Parton. Major Shelton advised Cook that not only should all positions be graded in accordance with the duties actually performed, but that the duties performed must be limited to the customers' needs.

In keeping with the procedure outlined by CPAC, Cook sent an e-mail to Coleman attaching Selwyn's revised position description on August 23, 2000. The attachment contained a description of Job Number AH257, for a Supervisory Contract Specialist located in Southwestern, Forth Worth, Texas. This description was heavily edited -- presumably to

-5-

conform it to the duties Selwyn actually performed.  Coleman, in turn, sent the description to Patricia Andrews ("Andrews"), Classification Specialist at CPOC to "see if it [would] fly as a GS-13."  (Def. Ex. 4.)

On September 15, 2000, Andrews responded that the "position description submitted for review is for a supervisory position and not a team leader position.  A team leader [position description] would not contain supervisory factor levels . . . [but would include] the nine FES evaluation factors."  (Def. Ex. 4.)  Andrews attached an example of a Team Leader "addendum" that could be used to revise the position description.  Importantly, not only did Andrews find the format of the job description itself to be unsatisfactory, but she also challenged whether this position could actually "fly" at a GS-13 grade level.  Specifically, Andrews stated that a GS-13 grade level could not be supported based on the current "supervisory duties," but instead would have to be accomplished through non-supervisory work, a description of which she did not have. In addition, Andrews noted that a Team Leader would only be one full GS grade level above the team members he or she supervises.  Notably, this advice matched Selwyn's August 1999 memorandum in which Selwyn recommended upgrading Carlton and Parton from a GS-11 to GS-12 grade level, as well as upgrading her own position to a GS-13 grade level.  At around that time, Cook informed Selwyn that her upgrade would be a "slam dunk" if Carlton and Parton were upgraded first.  (Doc. No. 34, Tr. at 20.)

On February 26, 2001, either as a result of Selwyn's memorandum, Selwyn and Cook's overall "strategy" or "restructuring" plan or Andrews' e-mail, Selwyn sent an e-mail to Coleman, with a copy to Cook and Restey, attaching a revised position description that reflected "the accurate . . . description for" Carlton and Parton.  (Def. Ex. 5.)  Selwyn requested that the

-6-

description be sent to CPOC in Huntsville, Alabama for classification.

On or around March 7, 2001, Phyllis Stepney-Johnson ("Stepney-Johnson"), a CPOC Classification Specialist located in Huntsville, Alabama, reclassified the Contract Specialist position description at the GS-12 grade level. (Def. Ex. 6.) Stepney-Johnson did not know who this position description was for, whether the individual was actually performing the duties identified in the position description, and never had any questions regarding the upgrade of the Contract Specialists' positions from a GS-11 to GS-12 grade level.

On March 12, 2001, Selwyn submitted a second draft of a description for her position to Cook, Coleman and Restey, stating that it was for "Huntsville to review." (Def. Ex. 7.) This position description was originally for Job Number AE06, Contract Specialist at the U.S. Army Missile Command at Redstone Arsenal, and had been edited presumably to reflect Selwyn's actual duties. The Army Missile Command ("AMCOM") is a large center for acquisition of missiles. AMCOM has several higher graded employees, including seven at the GS-15 grade level, twenty at the GS-14 grade level, and several at the GS-13 grade level. By contrast, the Nashville District Contracting Division's highest grade employee was Cook, the Chief of Contracting, at a GS-13 grade level.

Upon receiving it, Stepney-Johnson questioned the use of this position description, which required leader duties for sixty percent of the time, since the Nashville Contracting Division was so small in comparison to AMCOM. On April 19, 2001, Stepney-Johnson sent an e-mail to Coleman, with a copy to Selwyn, stating that the

> PD is fine, but I would question the percentage of time spent on leader duties. I can't see how to justify two GS-12s and one GS-11 needing a team leader. Especially at the GS-12 level you would think that they work with enough independence not to need a team leader. The supervisory ratio should be

Case 3:02-cv-01123   Document 39   Filed 01/20/06   Page 7 of 40 PageID #: 7

> something like 1:15 - 17 anyway (there are about 17 people in the division) - so I
> really don't see how to justify a GS-13 Team Leader for these 3 positions.

(Def. Ex. 10.) Stepney-Johnson also called Selwyn, who had been identified as the person to

contact for additional information, and informed Selwyn that to classify the position accurately,

she "needed some more duties in the" description. (Doc. No. 35, Tr. at 258.) Stepney-Johnson

informed Selwyn that the "position description couldn't be based on team leader duties anyway,

because it didn't have enough people." (Id.) Stepney-Johnson then created a model position

description and faxed a copy to Selwyn. This description first explained the position's major

duties and then listed nine "factors," such as knowledge, supervisory controls, and complexity,

among others. (Id.) Each of these "factors" was followed by a description and assigned a

certain "level," depending on the complexity or amount of the duties performed. (Id.) For

example, the model listed "Factor 1, Knowledge Required by the Position," as having a high 1-8

level. Finally, each factor/level was assigned a certain number of points. These points were

added together to determine the final grade. A GS-13 grade level required a range of 3155-3600

points.

Selwyn submitted a third position description draft, which was essentially identical to the

model provided by Stepney-Johnson. Upon receiving this third description, Stepney-Johnson

conducted further research. Stepney-Johnson discovered that Cook, Selwyn's supervisor, only

had a 1-7 knowledge level, whereas the third revised position description had a 1-8 knowledge

level. Stepney-Johnson again called Selwyn and informed her that the draft position description

could not have a 1-8 level if the supervisor only had a technical knowledge level of 1-7.

Accordingly, Stepney-Johnson and Selwyn discussed revising Cook's position description.

On April 30, 2001, Selwyn sent a fax to Stepney-Johnson stating: "Here's the

-8-

appropriate job description that describes Larry's position. He has made minor changes." (Def. Ex. 36.) This job description was originally for a Supervisory Procurement Analyst in Memphis that Cook and Selwyn had used as a model and revised. (Id.) Stepney-Johnson responded to Selwyn by e-mail on May 2, 2001 attaching a revised draft of Cook's position description. Selwyn responded on May 3, 2001 requesting one change and stating that the "rest of the document looks great!" (Def. Ex. 36.) Stepney-Johnson made the requested change and returned the revised position description to Selwyn that same day and Selwyn forwarded it to Coleman the next day, May 4, 2001. On May 8, 2001, Major Shelton authorized a Request for Personnel Action requesting that Cook's position description be updated. (Id.) Notably, the final position description did not list a "Factor 1, Knowledge Required by the Position." (Id.) Instead, the position description listed only six factors, compared to the nine factors listed in Selwyn's description, and was in an entirely different format from Selwyn's description. This is presumably because it was a position description for a supervisor and not a team leader. As a result, it is unascertainable from the record whether the 1-7 knowledge level was increased to a 1-8 level, or whether it was even necessary to do so, as the format of the position description had changed entirely.

After Cook's position description was updated, Stepney-Johnson received a call from Restey asking for an evaluation of Selwyn's position description. At the time, Stepney-Johnson had not completed her classification. Indeed, she continued to have doubts about the classification, and discussed it with her own team leader. Stepney-Johnson's team leader told her that the job description "was borderline between a 12 and a 13. And . . . that [she] needed to get with the supervisor and ask him for additional information." (Doc. No. 35, Tr. at 264.)

-9-

On August 2, 2001, Stepney-Johnson e-mailed Cook regarding the position description for Selwyn and attached a draft of the description. Stepney-Johnson stated:

> I have a few questions about the position plus John Restey has asked for an evaluation statement to see what made it a GS-13. When reviewing the [position description] it seems where the position could be borderline with GS-12 and GS-13. I have a few questions to help determine the final grade of the position.

(Def. Ex. 11.) Cook responded to Stepney-Johnson's questions on August 7, 2001. Stepney-Johnson incorporated the comments in the draft and discussed the revised draft with her team leader. Importantly, although both were not aware whose position description they were revising, they knew it was different from Cook's recently updated GS-13 position description. Accordingly, both agreed that although this position description had less supervisory duties than Cook's position description, it nonetheless merited a GS-13 grade level because of the technical knowledge required. Therefore, Stepney-Johnson and her supervisor believed that the position description merited a level 1-8 for "Factor 1, Knowledge Required by the Position."

Finally, on August 20, 2001, Stepney-Johnson, with no knowledge of whether an individual was actually performing the duties listed in the job description, sent Cook and Coleman an e-mail indicating that based on the information Cook provided, a GS-13 grade level would be "supportable." A copy of the position description was sent to Restey. Shortly thereafter, Restey sent Major Shelton an e-mail updating him of the status of the process.

Restey testified that as a human resources advisor, he was responsible for making "a recommendation as to whether or not the evaluation really reflected the duties of that position . . ." (Doc. No. 35, Tr. at 300.) Restey did not agree with the proposed classification for Plaintiff's position. He had the same concern that CPOC initially had regarding the 1-8 level on "Factor 1, Knowledge Required by the Position," but that CPOC, based solely on the position description,

-10-

had resolved in Selwyn's favor.  Restey felt that a 1-8 level on "Factor 1, Knowledge Required by the Position" was inappropriate for a District level position, because such a level of responsibility and technical complexity was not typical of a position at the District level.  Restey confirmed his view that a 1-8 level was inappropriate through Daphne Bradely at CPOC.  Restey discussed his concern with Cook and informed him that a 1-8 level was typically reserved for a major subordinate commander, a headquarters level position, an agency-wide expert or, at a minimum, a division-wide expert to whom other people in that particular field would turn. Restey also informed Cook that Cook's own position, as Chief of the Contracting Division, only had a 1-7 knowledge level.  Cook also testified that Restey questioned why Cook needed a GS-13 team leader to oversee the work of two full performance GS-12's.  In essence, Cook testified that Restey posed questions that Cook "had not given consideration to before."  (Doc. No. 35, Tr. at 210.)

Cook's meeting with Restey represented a turning point.  Prior to his discussion with Restey, Cook had actively supported Selwyn's request for an upgrade; he had found the proposed position descriptions Selwyn submitted accurately reflected Selwyn's duties; he had even worked on "the strategies for" the upgrade; informed Major Shelton of the upgrade; coordinated with CPAC to obtain the upgrade; and answered CPOC's questions.  Indeed, prior to meeting with Restey, Cook thought they "had succeeded in positioning [themselves] to get the position upgraded."  (Id. at 209-10.)  After this meeting, however, Restey noted that Cook had some concerns about Selwyn's proposed position description.  Shortly after his meeting with Restey, Cook met with Selwyn regarding the upgrade.  She testified that "he got real panicky looking on his face.  He is a very expressive person, so his expressions come out.  He turns red.

-11-

He wouldn't look at me. Just was real antsy with the news." (Doc. No. 34, Tr. at 30.)

Cook himself testified that he was "stunned." (Id. at 211.) Cook stated:

> At the time that I realized what we had done, the work that we had gone through to get to that point, and then to realize this was not going to work -- I mean, we had exhausted most everything I knew we could do. And this was not going to happen . . . . I simply stopped at that point. There was no point in going forward. . . . I simply decided that I did not need a team leader oversight for [two GS-12's] . . . and I decided I would put all three of the 12's into the same position description as performing the same functions.

(Doc. No. 35, Tr. at 211.) On cross-examination, Cook repeated:

> At that point, when I thought about what he had asked me, that was the first time I realized what he was saying, what anybody had said about needing a 13 to supervise a 12. I don't think that I ever thought about it before until then. And essentially I was stunned at the idea. We had come this far, nearly succeeded in what we were doing, to only realize that what we had done was to promote two people who were already performing at that level, and as a result, I didn't need a team leader over those people.

(Doc. No. 35, Tr. at 232.)

In light of his decision, Cook never recommended Selwyn's upgrade to Major Shelton. In addition, there was never a finalized position description for Plaintiff's proposed position at the GS-13 grade level because Cook did not advise Restey or Major Shelton whether the draft Stepney-Johnson classified accurately reflected Selwyn's duties. It is important to note that at this time, although Restey and Cook discussed Carlton and Parton as holding a GS-12 grade level, neither of them had been upgraded. Their upgrades were still contingent on Cook's approval that their position description, classified by CPOC in March 2001, accurately reflected their duties, and required Major Shelton's authorization, which had not yet been sought.

At some point Selwyn discussed her upgrade (or rather lack thereof) with Major Shelton. The date of this meeting is unascertainable from the testimony of those involved. Major Shelton

-12-

requested that Carlton and Parton join the meeting and questioned Selwyn regarding her level of

supervision and the percentage of time she spent supervising Carlton and Parton. Major Shelton

indicated that Selwyn

> would have to . . . [perform] at least 25 percent of her duties in a supervisory role
> of the . . . team members, in order to have a grade increase. And that more than
> likely that the members . . . [would have to be] GS-12's and not GS-11's. In other
> words, it would be unusual for someone to be promoted to a GS-13 because they
> were supervising more than 25 percent of their time, two GS-11's. It would be
> easier if they were GS-12's.

(Doc. No. 35, Tr. at 325.) Shelton's viewpoint echoed the advice of the first classification

specialist, Andrews, as well as Selwyn's initial August 1999 memorandum and Cook's views,

but were in direct contradiction to Restey and Stepney-Johnson's views. During this meeting,

although Carlton and Parton did not request an upgrade, Selwyn advised Shelton that they were

performing at a GS-12 grade level. Shelton reiterated to Selwyn what he had previously told

Cook, that if that were the case and the customers wanted Carlton and Parton to perform those

duties, their position descriptions should reflect their actual duties and they should be upgraded.

Indeed, pursuant to Major Shelton's instructions, a "validation" was sought for Carlton's

and Parton's position description. (Def. Ex. 29.) Janet M. Henderzahs ("Henderzahs"), Chief of

the Procurement Branch located in Louisville, Kentucky, was asked to conduct an on-site review

of Carlton's and Parton's duties and compare those duties to the position description. On

October 24, 2001, Henderzahs confirmed by e-mail that "[a]ll duties listed in the [position

description] are being done." (Id.)[3]

---

[3] The Court notes that although desk audits were supposedly no longer performed, and
Cook was unable to request one for Selwyn's position, this "validation" of Carlton's and
Parton's position description appears to closely resemble a desk audit.

On October 25, 2001, Cook sent an e-mail to Major Shelton, with a copy to Coleman, forwarding Henderzahs' e-mail and stated:

> Ms. Henderzahs' email completes the review process for the draft Position Description to up-grade the two current GS-11 contract specialists on the Environmental contracting team. . . . [Ms. Henderzahs] agrees the draft PD duties are currently being performed by the specialists. Now, I need to have a discussion with you and Wanda as to the next step in the personnel process. My plan has been to address grades of the working level contract specialists first. If it was determined the working level specialists should be up-graded, up-grade them and then address the teamleader position regarding up-grade.

(Def. Ex. 29.) According to his e-mail, Cook was still contemplating pursuing the upgrade for Selwyn.

On or about October 31, 2001, a meeting was convened with Selwyn, Major Shelton, Cook, Restey, Carlton and Parton. During this meeting, Carlton and Parton were informed that their positions would be upgraded from a GS-11 to a GS-12 grade level. Selwyn was informed either at that meeting or shortly thereafter, that her position would not be upgraded to a GS-13 grade level. Selwyn testified that the explanation she received from Cook for the failure to upgrade was "that it wouldn't be right for a GS-13 to supervise a GS-13." (Doc. No. 34, Tr. at 31.) Cook also later indicated that "he didn't see a reason why a GS-12 -- they should be full performing contract specialists, and they did not need a supervisor." (Id. at 37.) Selwyn testified that Major Shelton, on the other hand, "just said he was not going to do it." (Id. at 36.) Although Major Shelton had repeatedly advised everyone involved in the upgrades that positions would be upgraded as long as they accurately reflected the position duties and matched the customers' needs, at no point in time did Major Shelton read Selwyn's revised position description or, as far as the Court can discern, inquire whether Selwyn performed the duties for which she sought to be paid. It appears that Major Shelton simply operated on his perceived

-14-

assumption that Selwyn was not performing the supervisory duties required of a GS-13.

On November 1, 2001, Selwyn sent Major Shelton an e-mail attaching a document entitled "FASCLASSPosition Description - 12.rtf," and stated that CPOC had "confirmed" it. (Def. Ex. 9.)  Major Shelton asked Coleman what Selwyn meant by "confirmed," and Coleman responded

> CPOC probably confirmed that the amended position description would grade out at the 13 level.  However, no upgrade is final until you [Major Shelton], as Position Management Officer and the one who has delegated classification authority approves it by signing the DA374 which is the first sheet of the position description.  The attachment is a working draft, not a final copy.

(Id.)  It is clear that Major Shelton was aware that as the person with delegated classification authority, he was required to approve all upgrades.

Around that time, in November 2001, Cook had informed Selwyn that he would be giving her a special advisor role, but removing her team leader duties.  Selwyn had expressed concern about the revision in her duties at the time, and Cook had informed her that "it would be a performance issue" if she did not accept the revised duties.  (Doc. No. 34, Tr. at 38.)

When Selwyn realized that she would not receive the upgrade, she sought EEOC counseling on November 5, 2001, and filed a Formal Complaint of Discrimination in December, 2001.  Selwyn initially alleged that she was not promoted based on her sex.[4]  Selwyn amended her Formal Complaint in February 2002 to include the allegation of discrimination based on retaliation for prior EEO activity.  The record is unclear whether this retaliation claim was based on her November 1992, March 1996 or December 2001 EEO activity.  In any event, Selwyn

---

[4] This claim did not survive summary judgment because the Court found that Selwyn had failed to establish a prima facie case of sex discrimination.  (Doc. No. 25 at 27.)

made the retaliation claim on the belief that Cook and Major Shelton "misled me. They indicated that I was -- and acknowledged that I was doing the GS-13 level work. But then they decided that they did not want to do anything about recognizing that." (Doc. No. 34, Tr. at 33.) There is no question that both Cook and Major Shelton were aware of the December 2001 EEO activity. Cook was interviewed as part of the process, Major Shelton received a quarterly report of the pending EEO activities in the Nashville District, and both were present at a March 7, 2002 OCI fact finding conference. Both Cook and Major Shelton stated that their knowledge of Selwyn's EEO activity did not have any bearing on any decisions they made relating to Selwyn.

Carlton testified that in December 2001, she and Parton were upgraded from a GS-11 to a GS-12 grade level. In late March 2002, Cook held a meeting with Carlton, Parton, Selwyn, and Barbara Morris, an EEOC officer. During this meeting, Selwyn was provided a new position description in which her supervisory responsibilities were removed, and she was made a special advisor to Cook. Although Cook believed that this new special advisor role was a compliment to Selwyn, she found "it was just the same-old-same-old. And [Cook] was going to expect me to continue to manage the team, to do the work and to show him how to do the work, because he had no knowledge of how to do the work, or what was involved in the work." (Doc. No. 34, Tr. at 38.) Nevertheless, Selwyn also testified that Carlton and Parton no longer sought her assistance.

## B. FAILURE TO PROMOTE PLAINTIFF TO CHIEF OF CONTRACTING POSITION

Cook decided that he would retire in June 2002, and informed Major Shelton of his decision. In late 2001 or early 2002, Major Shelton contacted CPAC and initiated the process to

-16-

find a replacement. CPAC informed Major Shelton that the position would be advertised through a "referral system." At around that time, Major Shelton asked Cook to obtain samples of previous solicitations for chiefs of contracting, which Cook obtained from the Director of Contracting in Cincinnati, Susan Erwin ("Erwin"). After this initial involvement, Cook did not take part in any aspect of the hiring process. Cook did not even provide any recommendations or refer any applicants. Indeed, Major Shelton specifically informed Cook not to participate in the process. The Corps appointed a selection panel for the position of Chief of Contracting. Major Shelton was the panel chair and the initial panel members were Erwin, Barney Davis ("Davis") and Velma Salinas-Nix ("Salinas-Nix").

Selwyn learned about the position through the referral center in Fort Bellmore, and on January 14, 2002, submitted her resume for the Chief of Contracting position through RESUMIX, the Army's automated system. (Def. Ex. 37.) Plaintiff did not submit a copy of her annual performance evaluations with her application because she believed that the selection panel would have access to them through the Accomplishments and Career Brief Record. Indeed, the selection panel was provided an "Access Selecting Official Worksheet Report," which reflected Selwyn's grade level, her knowledge, ability and performance ratings for the past three evaluations. (Id.) Under "performance ratings," Selwyn was identified as having "exceptional" annual ratings from 1998-2000. (Id.) Other than the resume and the Access Selecting Official Worksheet Report, no other information about the candidate was included in the packet of information provided to the panel members for Selwyn or any of the other candidates. Major Shelton informed the panel members that they were restricted to using the information provided in the packets.

-17-

As panel chair, Major Shelton sent out the Selection Panel procedures to the panel members on January 30, 2002. (Def. Ex. 15.) A revised schedule for the selection panel, as well as proposed rating criteria and interview questions, were sent to the panel on February 5, 2002. (Def. Exs. 16-17.) The "Criteria to Evaluate Packets" stated: "Each panel member independently evaluates each candidate's level of knowledge, skill, and abilities (KSAs). . . . Resumes submitted to RESUMIX should be used in evaluating each KSA. . . . Evaluate the KSA using all available information about the candidate." (Def. Ex. 17.) Each applicant for the position of Chief of Contracting was evaluated through four KSAs -- Leadership, Experience in Contracting, Contracting System Integration and Continuous Improvement. (Id.) Each candidate was to receive a "-" if he or she met only the minimum standard for the KSA, a "0" if he or she "had something better", or a "+" if he or she greatly exceeded the KSA.

The panel initially convened via telephone conference on February 13, 2002. Before determining which of the candidates to interview, the panel first decided that they needed to interview at least three of the candidates. Then the panel members discussed the merits of each candidate. Instead of discussing how the panel members had rated each of the candidates pursuant to the -/0/+ rating system, the panel members simply indicated whether the applicant should be invited for an interview through a yes/no system. (Def. Ex. 18.) The candidates were separated into groups. The first group included three candidates who received a "yes" from three or four panel members. (Id.) The second group included six candidates who received a "yes" from one panel member. (Id.) The final group included eleven candidates who received a "no" from all panel members. (Id.) All three of the candidates in the first group were selected for interviews. Plaintiff was in the final group having received a "no" from all panel members, and

-18-

was not selected for an interview.

Two of the three applicants selected for interviews declined. The panel was advised of the refusals and decided to repeat the process a second time with the remaining applicants. On February 21, 2002, the panel had a second telephone conference, and using the yes/no system, divided the remaining candidates into the same three groups. The process garnered two additional candidates. For a second time, Selwyn was in the final group having received a "no" from all panel members, and was not selected for an interview. Again, two of the three persons selected for interviews declined.

At that point, Salinas-Nix could no longer participate as a panel member, and Wanda Carter-Davis ("Carter-Davis") replaced her on February 22, 2002. Carter-Davis, Chief of Contracting in Detroit, Michigan, had served on several selection panels during her twenty-year career. Prior to serving on the panel, Carter-Davis did not know Major Shelton or Selwyn. Further, Carter-Davis did not know any of the applicants or have any information regarding the applicants except what was provided to the panel. Carter-Davis was not provided any information regarding the ratings of the candidates from the prior panels.

By the third round, the rating system changed. In March 2002, Major Shelton contacted William St. John ("St. John"), Division Chief of Personnel located in Cincinnati, for advice regarding re-advertising the vacancy to obtain more candidates and regarding the panel selection procedures. First, the panel did not re-advertise the position, but instead accepted one additional application from Cassandra Mora ("Mora"), who was referred by panel member Erwin. Second, St. John advised the panel to revise the rating and ranking criteria to use a numerical 1, 3, 5 system, to represent candidates who were minimally qualified, qualified or highly qualified.

-19-

(Def. Ex. 24.)  If there were rating inconsistencies where one panel member rated an applicant as "highly qualified - 5" and another member rated the same applicant as "minimally qualified - 1," the members were required to discuss the disparity and, if necessary, change the rating.  (<u>Id.</u>) Not only were these procedures for accepting new candidates and rating them instituted after receiving advice from St. John, but Carter-Davis observed that the procedures used were not unusual and operated in the same manner as other panels with which she was familiar.

After accepting Mora's application and revising the rating criteria, the panel members independently rated and ranked all the applicants for a third time.  The results were compiled and a telephone conference was conducted in which panel members discussed the applicants who received a wide disparity.  After the discussion, certain individual scores were revised and then the total score for each candidate was computed.  This time, however, the panel decided to interview six candidates in order to have a sufficient field to interview.  The scores of all seventeen applicants ranged from a high of 72 to a low of 28.  The panel selected the first six applicants for interviews.  (Def. Ex. 26.)  After the interviews, Mora, who had previously attained a GS-13 grade level and was eligible for reassignment, was selected.

Selwyn received the following scores from Erwin, Davis, Carter-Davis and Shelton, respectively:  KSA 1 (Leadership) -- 3, 1, 3, 1; KSA 2 (Experience in Contracting) -- 5, 5, 3, 5; KSA 3 (Contracting System Integration) -- 1, 3, 1, 3; KSA 4 (Continuous Improvement) -- 3, 3, 3, 1.  (<u>Id.</u>)  Selwyn initially received a "5" from Erwin for KSA 4 (Continuous Improvement), but it was subsequently reduced to a "3."  Selwyn received a total score of 44, leaving her 10 points below the lowest score of the six applicants interviewed, and she was not selected for an interview.  Out of the seventeen applicants, Selwyn tied for eighth place with another candidate.

-20-

If Major Shelton had given Selwyn a "5" on KSA 1 and KSA 4 instead of a "1," and the score she received from Erwin was not reduced, she would have received the same number of points as Mora, the candidate who was selected.

## II.    LEGAL STANDARD

Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a) provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his [or her] employees or applicants for employment . . . because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." In order to establish a case of retaliatory discrimination under Title VII, the Plaintiff must show by a preponderance of the evidence that her employer intentionally discriminated against her because of her participation in protected activity.  Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792-4 (6th Cir. 2000).  Individuals who have participated in any manner in Title VII proceedings are entitled to "exceptionally broad protection."  Booker v. Brown & Williamson Tobacco Co. Inc., 879 F.2d 1304, 1312 (6th Cir. 1989).

A plaintiff may establish a case of Title VII discrimination by direct or indirect evidence. See Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997).  Direct evidence consists of evidence "which, if believed, proves the existence of improper discrimination animus without inference or presumption."  Williams v. United Dairy Farmers, 20 F. Supp. 2d 1193, 1198 (S.D. Ohio 1998) (citations omitted).  Because such "smoking gun" evidence is rarely available, a plaintiff may also establish discrimination through the use of indirect evidence or circumstantial evidence.  Woythal v. Tex-Tenn. Corp., 112 F.3d 243, 246 (6th Cir. 1997) (citation omitted).

-21-

"The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." Kline, 128 at 348-49. Title VII claims relying on indirect evidence are evaluated under the McDonnell Douglas burden-shifting analysis. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also EEOC v. Avery Dennison Corp., 104 F.3d 858, 862 (6th Cir. 1997).

Under the McDonnell Douglas analysis, the plaintiff must first prove by a preponderance of the evidence a prima facie case of discrimination. 411 U.S. at 802. In a Title VII retaliation case, a plaintiff must make out a prima facie case by showing that: (1) she engaged in activity protected under Title VII; (2) this exercise of protected rights was known to her employer; (3) the employer thereafter took an employment action adverse to the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) a causal connection existed between the protected activity and the adverse employment action or harassment. Morris, 201 F.3d at 792. The burden of establishing a prima facie case is not onerous and simply creates a presumption of discrimination or, in other words, "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981) (citations omitted).

If the plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for his or her actions. Id. at 253. "This burden is one of production, not persuasion . . . ." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993)). That is, the defendant is required to rebut the presumption of discrimination the

-22-

plaintiff has created by producing evidence that the defendant's actions are supported by "legitimate, nondiscriminatory reason[s]." Burdine, 450 U.S. at 254. Importantly, the "defendant need not persuade the court that it was actually motivated by the proffered reasons." Id.

If the defendant is able to accomplish this, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. at 253. Pretext can be demonstrated by showing: "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate [the adverse action]; or (3) that they were insufficient" to explain the adverse action taken. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994). The plaintiff, however, retains the ultimate burden of proving intentional discrimination at all times. Burdine, 450 U.S. at 256.

When the defendant, however, "fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the fact finder must then decide whether the rejection was discriminatory within the meaning of Title VII. At this stage, the McDonnell-Burdine presumption 'drops from the case' and 'the factual inquiry proceeds to a new level of specificity.'" United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-15 (1983) (citations omitted). Thus, after there has been a full trial on the merits, the district court must not dwell on whether the plaintiff has proven its prima facie case, but instead is required to decide the ultimate factual issue in the case: has the plaintiff proven by a preponderance of the evidence whether the defendant intentionally discriminated against the plaintiff? Noble v.

-23-

Brinker Int'l Inc., 391 F.3d 715, 725 (6th Cir. 2004).

The plaintiff may succeed in carrying its burden of persuasion "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. In the event the plaintiff takes the indirect route:

> The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.' . . . In other words, '[i]t is not enough . . . to dis believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."

Reeves, 530 U.S. at 146-7 (quoting Hicks, 509 U.S. at 519, 524) (emphasis in original). Nevertheless, disbelief in the employer's reasons together with the elements of the prima facie case may "suffice to show intentional discrimination," Hicks, 509 U.S. at 511, because "proving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination." Id. at 519 (emphasis in original). Similarly, there will be cases where "although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." Id. at 148. Therefore, although after a trial on the merits a court may no longer dismiss a case due to plaintiff's failure to establish a prima facie case, "the evidentiary underpinnings" of a plaintiff's prima facie case are still relevant and aid the Court's "determination whether the evidence in toto is sufficient to support a finding of intentional discrimination." Noble, 391 F.3d at 725.

## III. DISCUSSION

As this case went to trial, the Court must decide the ultimate factual issue: whether Plaintiff has proven by a preponderance of the evidence that Defendant (1) intentionally did not upgrade Selwyn from a GS-12 to a GS-13 grade level in retaliation for her 1992, 1996 and/or December 2001 EEO activity, and (2) intentionally did not promote Selwyn to the position of Chief of Contracting in retaliation for her December 2001 EEO activity.

### A.   FAILURE TO UPGRADE PLAINTIFF'S POSITION FROM GS-12 TO GS-13 GRADE LEVEL

Selwyn has established that she engaged in EEO activity in 1992, 1996 and, most recently, in December 2001. She has also established that Cook was aware of her 1992 and/or 1996 EEO activity, and both Cook and Major Shelton knew of, and were intimately involved in, Selwyn's December 2001 EEO activity. Similarly, Selwyn has demonstrated that she suffered an adverse employment action because she was not upgraded from a GS-12 to a GS-13 grade level. Selwyn, however, has failed to carry her burden of persuasion and show by a preponderance of the evidence that the decision not to upgrade her was in retaliation for her prior EEO activity. See Morris, 201 F.3d at 792.

### 1.   Lack of Connection Between Selwyn's 1992 and 1996 EEO Activities And Cook's Decision Not To Upgrade

To begin with, Major Shelton had no knowledge of Selwyn's 1992 or 1996 EEO activity. Even if he did have such knowledge, Major Shelton did not make the decision not to upgrade Selwyn because he never received a final request for re-classification from Cook. Accordingly, the sole question is whether Cook's knowledge of Selwyn's prior EEO activity influenced

Cook's decision not to seek an upgrade for Selwyn.

        i.      <u>Temporal Proximity</u>

Selwyn's allegation that Cook failed to request that she be upgraded due to his knowledge of her 1992 and/or 1996 EEO activity is without merit. These prior EEO activities occurred nine and six years, respectively, prior to Cook's decision not to request an upgrade for Selwyn. Generally, to succeed on a retaliation claim there must be some temporal proximity between the protected activity and the adverse action. <u>Wrenn v. Gould</u>, 808 F.2d 493, 500 (6th Cir. 1987) (stating that causal connection between protected activity and adverse employment action may be demonstrated through temporal proximity). Here, there is no temporal proximity with these two EEO activities and Cook's decision not to upgrade.

In addition, the fact that an adverse action occurs after protected activity has taken place is, standing alone, generally insufficient to support a finding of retaliation for participation in EEO activity. <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 566-67 (6th Cir. 2000) (stating that while there may be cases where evidence of temporal activity alone may be sufficient to support inference of discriminatory retaliation, generally courts require additional evidence of retaliatory conduct); <u>see also</u> <u>Hafford v. Seidner</u>, 183 F.3d 506, 515 (6th Cir.1999) (finding causal connection to be tenuous where plaintiff only showed disciplinary actions occurred two to five months after EEO activity without producing additional evidence of reprisal); <u>Cooper v. City of North Olmsted</u>, 795 F.2d 1265, 1272 (6th Cir. l986) (finding that adverse employment decision occurring four months after Plaintiff filed an EEO complaint was insufficient to establish case of retaliation); <u>Wheelwright v. Clairol, lnc.</u>, 770 F. Supp. 396, 401 (S.D. Ohio 1991) (holding

-26-

discharge of employee four weeks after EEO complaint by itself was insufficient to establish causal connection); Edwards v. Whirlpool Corp. Aviation Dep't, 678 F. Supp. 1284, 1291-92 (W.D. Mich. 1987) (explaining that discharge of employee one month after filing an EEO complaint, and two weeks after supervisor was notified of EEO complaint, was, absent other facts, insufficient to establish causal connection).  In the present case, other than the fact that the failure to upgrade occurred after Selwyn's 1992 and 1996 EEO activity, there are no facts demonstrating reprisal.

ii.     Cook's Actions Did Not Amount To Retaliation

Cook heard about Selwyn's prior EEO activity when he was located in the Cincinnati office.  Cook was not a target of the EEO activities, and barely knew about the subject matter, testifying that it was "over evaluations or something like that."  (Doc. No. 35, Tr. at 202.)  When Cook transferred to Nashville in October 1996, his knowledge of Selwyn's prior EEO activity does not seem to have affected him, as he asked Selwyn to lead the new environmental team.  Cook singled out Selwyn for this position because he believed she had the relevant work experience, acknowledging that it was Selwyn's "experience that allowed" the contracting division to be restructured.  (Doc. No. 35, Tr. at 196.)  On every annual evaluation Cook completed prior to the decision not to upgrade Selwyn, Cook gave Selwyn stellar evaluations, rating her as "excellent," the highest rating a person could receive.  Thus, Cook's behavior towards Selwyn during the time period closest to her prior EEO activity was favorable.

Furthermore, Cook testified, and Selwyn acknowledged, that Cook was fully supportive of Selwyn's attempt to obtain an upgrade, and even assisted her from August 1999 through

August 2001.  In August 1999, Cook requested Selwyn to draft a memorandum recommending how the team could be restructured so that she could be upgraded.  While there appears to be a gap of about a year where nothing was done, Cook eventually met with Coleman and Restey to discuss the procedure to upgrade Selwyn's position.  He informed Major Shelton in the latter half of 2000 that he was seeking an upgrade for Selwyn.  At that point, Major Shelton informed him that an upgrade would only be warranted if the actual duties were being performed and if the customer required such duties to be performed.  Notwithstanding Major Shelton's implicit skepticism, Cook continued to work on Selwyn's upgrade.  While Cook did not draft Selwyn's position descriptions himself, he forwarded Selwyn's drafts to CPAC when requested by Selwyn.  Further, when Stepney-Johnson of CPOC informed Cook that the "position could be borderline . . . [between] GS-12 and GS-13," Cook promptly (within five days) provided the additional information requested.  Indeed, it was Cook's response that supplied Stepney-Johnson with enough information to finally classify Selwyn's position at a GS-13 grade level.  Stepney-Johnson specifically stated "Larry, Based on the information that you provided, GS-13 is supportable."  (Def. Ex. 12.)

In addition to assisting Selwyn with her individual upgrade, Cook testified that he created the strategy to upgrade Carlton and Parton in order to make it easier for Selwyn to be upgraded.  While Selwyn believes that this information was misleading, Cook's belief that it would be a "slam dunk" to upgrade Selwyn was echoed by Major Shelton and Andrews, the first CPOC classifier to evaluate the position description.  Moreover, Cook actively participated in having his own job description revised to clear the way for Selwyn's upgrade.  In sum, Cook provided support, a "strategy," written comments and attempted to restructure the entire environmental

team in order for Selwyn to be upgraded. These facts just do not amount to discriminatory retaliation.

### iii. Position Description

Importantly, notwithstanding Selwyn's own belief that she was performing GS-13 grade level work, it appears that there was disagreement whether Selwyn's position actually merited a GS-13 classification. First, it took from August 2000 to August 2001 -- an entire year -- to obtain a GS-13 classification from CPOC. As far as the Court can discern, this delay was not due to tardiness; CPOC responded in a timely fashion to all requests from Nashville, whether they came from CPAC or Selwyn herself. Rather, the delay arose from the difficulty in classifying the position as a GS-13. In comparison, CPOC re-classified the position descriptions for Carlton and Parton in less than two weeks without requesting additional information or asking any questions. Similarly, Cook's position description was revised by CPOC within five days with a minimal exchange of e-mail and questions.

Second, Selwyn submitted at least three different position descriptions to CPOC. These draft position descriptions, although edited, essentially copied information from descriptions intended for different positions or larger operations. Selwyn's first draft was not even for a team leader, but for a supervisory position. In essence, she used a position description that was more fitting for Cook's position than her position. The second draft was more appropriate for a large center, rather than a small contracting division. The third draft was essentially created by Stepney-Johnson who did not know whether Selwyn actually performed the duties described.

Third, each time Selwyn submitted a new draft, CPOC questioned whether it could be

-29-

classified at a GS-13 grade level. The first time, in September 2000, Andrews found that the position lacked the requisite supervisory duties. The second time, in April 2001, Stepney-Johnson again questioned the lack of supervisory duties, and specifically informed Selwyn that the "position description couldn't be based on team leader duties anyway, because it didn't have enough people." (Doc. No. 35, Tr. at 258.) At that time, Stepney-Johnson also informed Coleman that she questioned the supervisory duties, stating "I can't see how to justify two GS-12s and one GS-11 needing a team leader. Especially at the GS-12 level you would think that they work with enough independence not to need a team leader. . . . [S]o I really don't see how to justify a GS-13 Team Leader for these 3 positions." (Def. Ex. 10.) The third time, unable to resolve the issue of supervisory duties, Stepney-Johnson focused instead on duties involving technical knowledge to reach a GS-13 classification. In addition, Stepney-Johnson not only sought advice from her own supervisor, but requested additional information from Cook. Even at this time, Stepney-Johnson and her supervisor believed that the position was "borderline between a 12 and a 13 . . . ." (Doc. No. 35, Tr. at 264.) When Stepney-Johnson finally approved the GS-13 classification, she informed CPAC in Nashville that a GS-13 is "supportable" -- hardly a ringing endorsement. Therefore, three different classifiers, Andrews, Stepney-Johnson and Stepney-Johnson's supervisor, had difficulty classifying Selwyn's position at a GS-13 grade level. Most importantly, although Stepney-Johnson eventually found that a GS-13 grade level was "supportable," she did not know whether these duties were actually being performed by Selwyn.

In addition, despite the fact that CPOC had concluded that a 1-8 knowledge level was permissible, Restey, the resident CPAC advisor, was in a position to analyze whether such a

rating was actually appropriate, and he concluded that it was not.  He specifically testified that in this particular case, he understood the situation better than CPOC.  Restey opposed the fact that Selwyn's position description should receive a 1-8 level on "Factor 1, Knowledge Required by the Position" on two counts.  First, he did not believe that this was appropriate given that Cook, Selwyn's immediate supervisor, only had a 1-7 knowledge level.  As Cook's position description was significantly revised, was in a different format and did not include the "Factor 1, Knowledge Required by the Position," the Court finds that this rationale for denying Selwyn an upgrade is ambiguous at best, and invalid at worst.

Restey's second explanation is more plausible.  Restey believed that a 1-8 level was inappropriate for anybody at the District level.  Restey explained to Cook that such a rating was typically reserved for a major subordinate commander, a headquarters level position, an agency-wide expert or, at a minimum, a division-wide expert.  While everybody agrees that Selwyn had significant contracting experience, she did not hold any of the positions Restey listed, but was simply a Team Leader.  In addition, Restey found that if Carlton and Parton were performing at a GS-12 level, they did not need supervision from a GS-13, a concern previously raised by Stepney-Johnson.  Restey's opinion that GS-12's required little supervision was bolstered by the fact that Selwyn herself needed little supervision at the GS-12 level.

After speaking with Restey, Cook changed his mind regarding the upgrade.  Clearly Cook was heavily influenced by Restey's judgment.  Whereas he had been fully supportive in the past, Cook testified that after speaking with Restey he was "stunned," that they had "exhausted" all avenues, that he "simply stopped at that point," and that "there was no point in going forward."  (Doc. No. 35, Tr. at 211.)  Restey's influence over Cook, however, is

-31-

completely unrelated to Selwyn's prior EEO activity. Indeed, Selwyn did not allege or establish

any facts that Restey had knowledge of her prior EEO activities. It simply appears that Cook

had not thought about the consequences of his "strategy" and/or did not understand the process.

In fact, Restey testified that

> Cook didn't have a thorough understanding of the position
> classification standards, and what it required to assign that level.
> And that even if those duties . . . were accurately described, . . .
> [they] still did not rise to that level, and . . . it was inappropriate to
> assign [a] 1-8 to that position, in the Nashville District.

(Doc. No. 35, Tr. at 319.)

In addition, Cook may have been influenced by Major Shelton who did not believe that

Selwyn was performing duties required of a GS-13 level. Although Major Shelton's belief was

unsupported -- he had not even read the position description in order to compare it to Selwyn's

actual duties -- Major Shelton's belief is unrelated to Selwyn's prior EEO activity, of which he

had no knowledge.


iv.     Lack Of Causal Connection

That Cook would wait nine or six years to express any animus he may have felt towards

Selwyn stemming from the 1992 and/or 1996 EEO activities is entirely unsupported by the

record. In sum, it is more probable than not that Cook's decision not to seek an upgrade for

Selwyn was tied to the fact that the job description and her duties bordered between a GS-12 and

GS-13 grade level, Restey and Major Shelton's perceptions, and divergent views of what

constituted GS-13 grade level work, rather than reprisal for EEO activity that took place years

ago. Part of the problem appears to have arisen from the fact that Selwyn was drafting her own

position descriptions, and Restey, Major Shelton and Cook were not reviewing these descriptions closely <u>before</u> they went to CPOC to verify that they were accurate. Similarly, CPOC was communicating directly with Selwyn, so issues that CPOC resolved in favor of Selwyn (the 1-8 knowledge level and the lack of supervisory duties) were not discussed or resolved with Restey and Major Shelton. While this Court finds it disturbing that nobody actually <u>verified</u> whether Selwyn's duties matched the position description, as was done for Carlton's and Parton's positions, the Court simply cannot find a connection between the failure to upgrade and Cook's knowledge of Selwyn's prior EEO activity.

>    2.    *Lack Of Causal Connection Between Selwyn's December 2001 EEO Activity And Cook's Decision Not To Upgrade*

Next, Selwyn's allegation that Cook and Major Shelton failed to upgrade her based on her December 2001 EEO activity is also without merit. Importantly, Selwyn sought EEOC counseling on November 5, 2001, and filed a Formal Complaint of Discrimination in December 2001. At the time of her initial EEOC counseling, and by the time of her Formal Complaint, she had already been informed by both Cook and Major Shelton that she would not be receiving an upgrade, while both Carlton and Parton would receive an upgrade. As a result, the decision not to seek an upgrade was made before, and was final by the time, Selwyn filed her complaint in December 2001. As a result, Selwyn's failure to upgrade claim could not be based on the December 2001 EEO activity, because that activity <u>had not yet</u> occurred.

Selwyn's attempt to argue that she was effectively "demoted" in retaliation for her December 2001 EEO activity also fails. Selwyn argues that this "demotion" occurred in March 2002, three months after the filing of her EEO complaint. Selwyn, however, testified that Cook

informed her in November 2001 that her position description was going to be revised and that she would no longer be a team leader, but would maintain a "special advisor" role. Cook also testified that the decision to reduce her team leader responsibilities occurred shortly after his meeting with Restey. Thus, even though this "demotion" was instituted in March 2002, the decision to so restructure the team occurred prior to Selwyn's December 2001 EEO activity and Selwyn was well aware of that decision. In conclusion, Cook's and Major Shelton's knowledge of the December 2001 EEO activity could not have been the basis for the "demotion" because it had not yet occurred. Furthermore, the Court finds no link between the "demotion" and Cook's knowledge of Selwyn's 1992 and/or 1996 EEO activity for the reasons identified in Section III.A.1, supra.

As such, Selwyn failed to show by a preponderance of the evidence that the decision not to upgrade her was motivated by Cook or Shelton's knowledge of her various EEO activities.

### B. FAILURE TO PROMOTE PLAINTIFF TO CHIEF OF CONTRACTING POSITION

Selwyn has established that she engaged in EEO activity in December 2001. She has also established that Cook and Major Shelton were aware of and intimately involved in the EEO activity. Similarly, Selwyn has demonstrated that she suffered an adverse employment action because she was not selected for the position of Chief of Contracting. Selwyn, however, has failed to carry her burden of persuasion and show by a preponderance of the evidence that the decision not to select her for the position of Chief of Contracting was in retaliation for her

December 2001 EEO activity.[5]  See <u>Morris</u>, 201 F.3d at 792.

It is clear that Cook's knowledge of Selwyn's December 2001 EEO activity played no role in the failure to promote Selwyn to the position of Chief of Contracting.  Other than obtaining samples of previous solicitations for chiefs of contracting, Cook was not involved in the process of selecting his replacement.  He was specifically asked by Major Shelton not to participate, and did not provide any recommendations or refer any applicants.  As a result, Cook had absolutely no involvement -- positive or negative -- in selecting the next Chief of Contracting for the Nashville District.  Accordingly, the sole remaining issue is whether Selwyn was not selected for the position of Chief of Contracting due to Major Shelton's knowledge of, and in retaliation for, Selwyn's December 2001 EEO activity.


   i.  <u>Selection Process</u>

Selwyn argues that although the panel had access to her annual performance evaluations, they were disregarded because Major Shelton prevented the panel from accessing or reviewing them.  These annual performance evaluations, asserts Selwyn, would have increased her scores in KSA 1 (Leadership) and KSA 4 (Continuous Improvement).  The testimony of the two panel members, Major Shelton and Carter-Davis, and  the CPAC advisor to the panel, Coleman, was clear that none of the annual performance evaluations for any of the candidates were included in the packet of information provided to the panel members.  Therefore, Selwyn was treated in the same manner as the other applicants.  In addition, the panel received the resumes submitted

---

[5]  Plaintiff does not allege that the decision not to select her for the position of Chief of Contracting was motivated by the 1992 and/or 1996 EEO activity.

through RESUMIX and an "Access Selecting Official Worksheet Report" that provided a summary of the candidate's past three evaluations. Selwyn's report identified her has having "exceptional" annual ratings from 1998 to 2000. Accordingly, Selwyn was not harmed by the exclusion of the actual annual evaluations because the panel members were aware she was considered to be "exceptional" by her supervisors. Further, while Selwyn is correct that the "Criteria for Evaluation" informed the panel members to evaluate the candidates based on all available information, the universe of "all available information" was limited to the information in the packets, and the panel was not permitted to conduct independent research on each individual candidate. In light of this restriction, it would have been inappropriate for Major Shelton alone to rely on Selwyn's annual evaluations to which other panel members did not have access.

Selwyn also contends that as senior rater on her annual evaluations since 2000, Major Shelton recognized her leadership qualities and her ability to improve. In contrast, when evaluating her application for the Chief of Contracting position, Major Shelton only rated Selwyn as minimally qualified, giving her a "1," for KSA 1 (Leadership) and KSA 4 (Continuous Improvement). Selwyn asserts that Major Shelton's low scores in these two categories are in direct contradiction to her annual evaluations, and are evidence of unlawful retaliation. Major Shelton explained, however, that criteria used to evaluate the KSAs for each applicant were different from the criteria used to complete an annual evaluation. Indeed, the KSAs provided a uniform method of evaluating the applicants, while annual evaluations depended on the subjective criteria of each individual supervisor. Importantly, the panel was provided with detailed criteria for the level of knowledge, skill and abilities required of a <u>chief of</u>

contracting, while Selwyn's annual evaluations described her knowledge, skill and abilities as a team leader. By arguing that the panel members should have reviewed the annual evaluations in order to determine her score for each KSA, Selwyn is expecting a comparison of apples to oranges. In fact, the leadership and continuous improvement skills that she performed on an exceptional basis as a Team Leader were deemed by all the panel members to only meet the minimal or sufficient qualifications desired for the Chief of Contracting position.

In addition, Selwyn's scores on all the KSAs are reflective of the problems she had with the attempted upgrade from GS-12 to GS-13. That is, Stepney-Johnson found that Selwyn's position could be re-classified at the GS-13 grade level based on Selwyn's technical knowledge, but not based on her leadership duties. Indeed, the lack of leadership duties was the very reason that Selwyn's upgrade request was repeatedly rejected. Similarly, Selwyn was rated as "highly qualified," and received a "5" from three panel members, including Major Shelton, for KSA 2 (Experience in Contracting). In contrast, she received two "3s" and two "1s" for KSA 1 (Leadership). It is evident that being a team leader of a team consisting of two to three individuals does not require the same skills as a leader for an entire contracting division consisting of many more individuals.

Further, there is no evidence to support the charge that Major Shelton gave her lower scores in retaliation for her December 2001 activity. The fact that Major Shelton gave her low scores in certain categories is not, in and of itself, evidence of retaliation. First, Major Shelton was not alone in giving Selwyn the lowest score for KSA 1 (Leadership); panel member Davis independently concurred with Major Shelton and also gave Selwyn a "1." Furthermore, with regard to KSA 1, Erwin and Carter-Davis did not stray very far from Major Shelton's and Davis'

-37-

assessment and only found Selwyn to be "qualified," giving her a "3". Second, Major Shelton was the only panel member to find Selwyn to be minimally qualified and gave her a "1" in KSA 4 (Continuous Improvement), whereas all the other panel members gave her "3s." However, other than the fact that this selection process came on the heels of the EEO activity, there is simply no evidence that this low score was fueled by Major Shelton's knowledge of Selwyn's December 2001 EEO activity. Third, low scores in leadership and continuous improvement were contrasted by Major Shelton's award of a high score of "5" in KSA 2 (Experience in Contracting) and of an average score of "3" in KSA 3 (Contracting System Integration). Fourth, assuming that without knowledge of the EEO activity Major Shelton would have given Selwyn scores consistent with the other panel members for KSA 1 and KSA 4, he would have given her a "3," the highest score she received from any panel member in these categories. These would still not have provided her with sufficient points to be interviewed. Fifth, and perhaps most importantly, other than on KSA 4, Major Shelton's scores were entirely consistent with the scores of the other panel members. Sixth, each member of the panel made his or her conclusion independently, and only discussed his or her views after all the panel members' ratings were compiled. Indeed, only one of Selwyn's scores was changed after the discussion. Thus, even if Major Shelton wanted to discriminate against Selwyn, his opinions obviously did not heavily influence the other panel members. Finally, it is important to note that Selwyn did not fare well in the earlier rounds of the panel's selection process. After each of the first two rounds, the panel, after an independent review of each applicant, unanimously declined to interview Selwyn.

Furthermore, at trial Selwyn alluded to her belief that the position of Chief of Contracting was advertised in violation of Army regulations, and that Mora's application was inappropriately solicited by panel member Erwin and accepted during the final round of the recruiting process. The Court finds, however, that the recruitment and selection process for the Chief of Contracting position was conducted in accordance with the applicable regulatory authority.

First, with regard to the advertisement of the position, Selwyn incorrectly assumed that the Army Regulation No. 690-1-12, Merit Promotion and Placement Program of the Corps' Great Lakes and Ohio River Division, was to be followed.  (Def. Ex. 22.)  Section 3-l of the regulation specifically excludes Career Program positions, which includes the Chief of Contracting position, from the Merit Promotion and Placement Program, and instead requires such positions to be filled pursuant to Army Regulation 690-950.  Further, Selwyn was not harmed by the lack of advertising because she herself applied for the position.

Second, to the extent that Selwyn contends that Mora was inappropriately solicited, St. John testified that Army policy allows a selection official to consider several recruitment sources.  In this instance, valid sources were the career program register and individuals who had previously attained the grade of GS-l3, or higher.  (Def. Ex. 23 at 13, §§ 2-7; 2-9.)  Army Regulation 690-950 specifically allows the selection official to offer the vacant Chief of Contracting position on a non-competitive basis to people who are eligible for reassignment, for which Mora was eligible.  (Id.)  St. John also stated that it was appropriate to add additional candidates after the referral process had started, particularly since many of the initial applicants declined an interview.  In fact, St. John specifically advised Major Shelton that it was

appropriate to seek additional applicants in that manner.

In sum, Selwyn failed to show by a preponderance of the evidence that she was not selected for the Chief of Contracting position in retaliation for her December 2001 activity.

## IV.  CONCLUSION

The Court concludes that Plaintiff has failed to establish that she was retaliated against due to her protected Title VII activity when her position was not upgraded from a GS-12 to a GS-13 grade level, and when she was not selected for the Chief of Contracting position for the Corps' Nashville District.  The Court **ENTERS JUDGMENT** in favor of Defendant.

It is SO ORDERED.

Entered this the 20th day of January, 2006.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT

-40-